### 5184.   MOBLEY v. THE STATE.

1. In a prosecution for a violation of section 715 of the Penal Code, generally known as the "labor-contract act," the burden is upon the State to show that the hirer alleged to have been damaged has in fact sustained a loss capable of definite computation.

2. The "labor-contract act" was not designed to afford machinery for the collection of debts by criminal prosecution, but was intended to apply only to cases where punishment should be inflicted upon those who obtained money, or other advance of value, by fraud and with the intent to cheat and damage the opposite party to the contract. It is axiomatic

that where no loss is shown to have been sustained by a person alleged to have been defrauded, the act alleged to be fraudulent is not punishable as a crime.

3. The conviction in this case was wholly unauthorized.

DECIDED OCTOBER 30, 1913.

Accusation of cheating and swindling; from city court of Millen —Judge Thomas L. Hill. August 18, 1913.

*C. B. Garlick*, for plaintiff in error.

*W. Woodrum, solicitor*, contra.

RUSSELL, J. The record in this case, to our mind, develops a remarkable state of facts. In saying this we, of course, accord to the testimony in behalf of the prosecution the same preference which the judge (who tried the case without a jury) gave it, and disregard entirely the defendant's showing so far as in conflict with it. The defendant was charged with a violation of the "labor-contract act" (Acts of 1903, p. 90), embodied in sections 715 and 716 of the Penal Code, and was adjudged guilty and sentenced to serve twelve months upon the chain-gang, without any alternative. A review of the evidence shows that the accused had contracted to serve as a farm laborer, or share-cropper, with the prosecutor for twelve months from January 1, 1913, to January 1, 1914. He worked from January 1, 1913, until May 10, 1913, and during that entire period, according to the testimony of the prosecutor himself, received the sum total of $11.20, $10 of which was paid him in December, 1912, at the time the contract was made, $1.20 being the sum paid in May, 1913, upon which the prosecution in the case at bar is based. The defendant was one of three share-croppers with whom the prosecutor contracted at the same time; and though the prosecutor contracted with each separately, it appears that the three were to jointly cultivate, in corn and cotton, in return for one half of the crop they might by their labor produce, 70 acres or more on the prosecutor's plantation. According to the testimony the contract of the prosecutor with the defendant, as with each of his co-laborers, made them what are ordinarily known as "croppers," and, as a legal result of this relation, the title to the crop was in the prosecutor as landlord. Tolbert and Alonzo Wright, the two persons who, according to the testimony of the prosecutor, severally contracted with him to cultivate the two tracts of land jointly with the accused, so far as appears from the record, con-

tinued in service, and no complaint is made that they were not still laboring at the time of the trial.

The testimony does not show that the defendant did not work faithfully, barring lost time (probably caused by bad weather), during the four and a third months of his service under the contract, but the prosecutor testified: "On the 10th day of May he got $1.20 in money from me, of the value of $1.20. He told me he wanted the money, and I let him have it because he was working on a share-crop with me. I would not have *loaned* the money if he had not been working with me. After obtaining the $1.20 Jule Mobley quit the crop and left, and never worked any more in the crop. He has done no work for me since, neither has he paid nor offered to pay me the $1.20 back." The prosecutor further testified that the defendant left because he did not want to pay the prosecutor, and that he (the prosecutor) was damaged $1.20, and was damaged more than this because his crop suffered for want of work. He testified also that he paid the defendant's road tax (amounting to $3), but, since there is no suggestion that this payment was made at the request of the defendant, and since no one can, as a matter of right, make another pay his debts by paying them for him and then requiring that the sum advanced be repaid, this payment is immaterial.

1. Leaving out of view the question whether the prosecution's case failed because of failure to prove that the accused did not have good cause for quitting the service of the employer with whom he had contracted (*Johnson* v. *State,* 13 *Ga. App.* 586, 79 S. E. 179),— for it is evident that the prosecutor's testimony upon this point is purely opinion, without the statement of a single fact from which the court could for itself determine whether the conclusion reached was correct,—the real question in the case is whether the record shows that the employer sustained loss. A citizen can not be deprived of his liberty or convicted of crime upon suspicion that he has caused a loss, or because of an imaginary loss. When loss is made the basis of a fraud alleged to be criminal, it must be proved to be an actual loss, definite in amount and capable of exact computation. It is no longer an open question that proof of actual loss is essential to authorize a conviction of the offense denounced in section 715 of the Penal Code. *Millinder* v. *State,* 124 *Ga.* 452 (52 S. E. 760) ; *Abrams* v. *State,* 126 *Ga.* 591 (2), 593 (55

S. E. 497); *Coleman* v. *State*, 6 *Ga. App.* 398 (65 S. E. 46). On the direct examination, as we have already stated, the prosecutor testified that he was damaged in the amount of $1.20, which the accused obtained from him, and which he would not have "loaned" the accused but for the fact that he was in his employ, and that he also sustained some damage (not estimated), due to the fact that his crop had suffered for lack of cultivation. Upon cross-examination the prosecutor (who was the only witness) testified that the crop which the accused, jointly with the Wrights, was to cultivate, could reasonably be expected to make thirty bales of cotton, worth ten or twelve cents per pound, and that the corn crop would amount to fifty bushels of corn, and after payment of the expenses and of advances made to the croppers, amounting to about $600, he would get one half of the net remainder. Properly construing the testimony, the thirty bales of cotton would be worth at least $1,800 (viewed as commercial bales averaging 500 pounds each), and the corn would be worth $50, making $1,850 for the receipts (to say nothing of the cottonseed and fodder, which this court knows to be marketable); which would leave $1,250 (after deducting the $600 above stated, as expenses and advances), a half of which, or $625, would be the property of the prosecutor. In the meantime, and until there is a settlement and the advances and expenses —whether they are greater or less—are paid, the entire crop is in the absolute control of the prosecutor. Civil Code, § 3707.

To say the least of it, we do not think that the evidence showed, beyond a reasonable doubt, that this laborer, in procuring the loan of $1.20 after four and a half months of faithful service, intended to defraud his employer. It is a matter of common knowledge that ordinarily by the 10th of May arable land has been prepared for planting and corn and cotton have been planted, and have generally received their first working. There is nothing in the record to suggest that this was not true in the present case. It might have been possible for the prosecutor to prove his loss with sufficient definiteness to have established it, but he did not attempt to do so, and, on the contrary, it appears that one Charley Wright came to the defendant's place after the defendant left, and took the defendant's place in the crop, and that Charley Wright will be paid out of the crop as a part of the expenses. There is nothing to suggest that Charley Wright is not as good a farm-hand as the defendant,

and therefore it devolved upon the State to show how the crop was damaged by the exchange of laborers, and, definitely, how much the damage amounted to. This the State failed to do. From the figures in the record it seems to us that the defendant, who abandoned his third of a half interest in the crops is the only probable loser actually disclosed. But if, as a matter of fact, the sum of $1.20 loaned him, and the $1.20 for extra plowing on Lije Fleming's crop, was the only cash advanced him up to May 10, we can not greatly blame him for seeking greener fields and pastures new. As an obiter we would say this would be good cause for quitting.

2. We regret that there seems to be a very prevalent misapprehension of the scope and purposes of section 715 of the Penal Code, ordinarily known as the "labor-contract act" of 1903. This statute was not designed to afford machinery for the collection of debts by criminal prosecution, but it was intended to apply only to cases where punishment should be inflicted upon those who obtained money, or other advance of value, by fraud and with the intent to cheat and damage the opposite party to the contract. It is axiomatic that where no loss is shown to have been sustained by a person alleged to have been defrauded, the act alleged to be fraudulent is not punishable as a crime. In the present case, aside from the absence of any proof that the employer sustained actual loss, the fact that the servant and farm laborer discontinued his service after having obtained as small a sum as $1.20, after having given satisfactory service for more than four months, and after having apparently performed all the hard labor incident to the preparation for planting, does not beyond a reasonable doubt compel the conclusion that this servant, at the time of the advancement or loan, harbored and was actuated by a definite intent to defraud. The defendant is a human being. He may be presumed to have some knowledge, indefinite though it may be, of the value of his services in preparing the ground and planting the crop. Presumably he knew the amount of the advances made to him, and if, as an intelligent being, he knew that he had given full value, or more than value received, for all of the advances he had obtained, he would not have had an intent to defraud, even if he had intended to quit his master's service at the time he asked for the loan. Of course, in quitting, the servant acts at his peril in becoming judge in his own case, and he must take the consequences if he judges

wrongly. But when his act is called in question the law places upon the prosecution the burden of proving beyond any reasonable doubt that at the time the servant quitted the service of his employer, he either knew, or reasonably should have known, that his act would impose a loss. In *Mulkey* v. *State,* 1 *Ga. App.* 521 (57 S. E. 1022), and in *Patterson* v. *State,* 1 *Ga. App.* 782 (58 S. E. 284), we pointed out that the intent to defraud was one of the absolutely essential ingredients of the offense denounced in section 715 of the Penal Code. It rests upon the State to prove the existence of this intent at the time the advance was made which it is claimed was procured by fraud. The offense of cheating and swindling, based on the violation of a contract to perform services, so far as it is affected by the element of fraud, does not differ in any respect from other offenses into the perpetration of which fraud enters as a controlling ingredient. In all cases, civil or criminal, where fraud is claimed to have been committed, the charge fails when it appears that no loss resulted from the act alleged to have been fraudulent. No loss, no fraud. This is true in law at least, and we think it is also sound in morals.

3. Under the rulings in *Young* v. *State,* 3 *Ga. App.* 463 (60 S. E. 117), *Holloway* v. *State,* 6 *Ga. App.* 243 (64 S. E. 671), and *Coleman* v. *State,* 6 *Ga. App.* 398 (65 S. E. 46), the evidence was wholly insufficient to authorize the conviction.

*Judgment reversed.*